UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : |
| VS. | : CIVIL ACTION NO: 3:05CV86 |
| | CRIMINAL NO: 3:02CR00275(JCH) |
| DANVIL DAVIS, | : |
| Defendant. | : JUNE 6, 2005 |

### AFFIDAVIT OF COUNSEL

Andrew B. Bowman, having been sworn, deposes and says:

1. This affidavit is submitted in response to the Order of the Honorable Janet C. Hall dated May 27, 2005 in which the Court specifically ordered that I provide affidavit testimony to counsel of record in this proceeding concerning the issues raised by Danvil Davis as part of his claim of ineffective assistance of counsel on or before June 6, 2005.

2. I have previously refused to provide confidential or privileged information which I acquired during the course of my representation of Danvil Davis. In light of the May 27, 2005 Order, I now make this affidavit.

EXHIBIT 1

3. I was retained to represent Danvil Davis by his sister Almena Thompson to whom I would speak by telephone and who came to my office to consult with me about Danvil on many occasions during the course of the prosecution leading up to sentencing. I entered my appearance for Mr. Davis on or about December 20, 2002.

4. I first met Mr. Davis on or about December 18, 2002 in the lock up of the Hartford Superior Court where he had been transported from the Walker Correctional Institution. A court appearance on the state drug charges arising out of his October 15, 2002 arrest for possession with intent to distribute 500 grams of crack cocaine had been scheduled for that date. I had intended to proceed to Walker but learned that Mr. Davis was being transported to Hartford Superior Court on that date and met Mr. Davis at the courthouse.

5. On December 29, 2002 I again met with Danvil Davis at the Walker Correctional Institution in Suffield, Connecticut and discussed the nature of the case in detail as well as his employment history including his employment with the Hartford Police Department as a mechanic and his recollection of the events which formed the basis for the federal indictment and the state drug charges.

6. On January 10, 2003 I met with AUSA Runowicz at which time we discussed the nature of the evidence and the exposure faced by Mr. Davis.

7. On January 14, 2003 and February 4, 2003 I also discussed Mr. Davis' legal status in state court with attorney Stephen Meo who was his state court appointed counsel.

8. On or about February 27, 2003 I met with Mr. Davis at the Walker Correctional Institution and played the tapes, having received permission from officials at Walker the day before to bring the tapes and recording equipment into the prison.

9. Throughout the spring and summer I continued to have discussions with Almena Thompson who visited her brother regularly at Walker, with Mr. Runowicz and with attorney Meo.

10. On April 30, 2003 Mr. Davis and I met with AUSA Runowicz and DEA special agent Brent Buckles at the New Haven federal courthouse.

11. The purpose of the meeting with the government was two fold. First, the purpose of the meeting was required because of the "safety valve" provisions of 18 U.S.C. §3553(f) and second, to determine whether the defendant could provide substantial assistance thus qualifying him for a government motion for downward departure.

12. Subsequently, there were telephone conferences with AUSA Runowicz and Almena Thompson as well as with attorney Meo to make certain that the State would

nolle Mr. Davis's state court charges in favor of a federal disposition. The State was prosecuting Mr. Davis on the 500 grams of crack cocaine seized on October 15, 2002, the sentence for which could have been not less than 5 nor more than 20 years pursuant to §21a-278(a) of the Connecticut General Statutes.

13. Danvil Davis provided me with information that was corroborated by Almena Thompson regarding his children with three separate women, the fact that he suffered from Hepatitis B and that he had no prior record. Davis advised that he obtained the cocaine and crack cocaine from two different individuals both of whose identities were provided to the government on April 30, 2003 during the proffer session. Davis described his relationships with his children, his upbringing in Jamaica and his immigration to the United States as well as the various relationships he had with his siblings all of whom came to Court on both the date of his guilty plea and his sentencing. It should be noted that Ms. Thompson was overwhelmed and did not arrive at sentencing until after it was over.

14. I interviewed Deborah Davis the divorced wife of Danvil who provided a letter to the Court which was consistent with what she advised me in person. She had been married to Danvil Davis since November 1988, and they had a daughter, Ahjza. They were divorced on August 14, 1995 but she maintained a good relationship with her

4

husband and related to me her impressions of Danvil and the impact of his imprisonment on the support of their child.

15. I interviewed Lovenia Turner, the mother of Destiny Davis, another child of Danvil whose letter was submitted to the Court.

16. At no time did Danvil, Danvil's former wife Deborah, his girlfriend of 13 years, Lovenia Turner, or his sister Almena Thompson ever describe Danvil as being a compulsive gambler or as an individual who squandered his earnings by gambling.

17. I knew that Danvil Davis's drug sources were individuals he met with and knew from off-track betting. Also, these individuals were identified by Mr. Davis and described during the April 30, 2003 proffer session.

18. I was aware at the time and I remain aware of downward departure motions based upon compulsive behavior generally and specifically compulsions relating to gambling. Neither Danvil Davis, his sister Almena Thompson, his former wife Deborah Davis, his girlfriend Lovenia Turner or his other siblings ever described factual circumstances from which I could infer that Mr. Davis became involved in these sales of cocaine and cocaine base because of an addiction to gambling or anything like it.

19. With respect to arguments relating to sentencing manipulation or sentencing entrapment as described in Mr. Davis's §2255 petition as well as the Court's

comments during sentencing on December 8, 2003, I did not pursue the entrapment and manipulation arguments for the following reasons:

First, Mr. Davis exhibited what I observed to be facile understanding of drug terminology used during the tape recordings which were made prior to and during the execution of the drug transactions for which he was charged. The evidence was that Mr. Davis always received the drugs from suppliers who fronted the drugs to him and who would be repaid, less Mr. Davis's cut, after the drug transaction had been completed. Davis's sources appeared to trust him with large quantities of drugs.

Second, the informants did not appear to have any leverage against Mr. Davis. For example, he was not drug dependent, and he was not otherwise indebted to them which would have put them in a position to exact obedient performance on his part under duress or compulsion.

Third, the drug quantities remained constant on July 22, July 31 and August 14, 2002. (The first sale involved cocaine hydrochloride and the remaining sales involved cocaine base). Subsequently on September 24, 2002 Davis sold approximately 246 grams of 40% pure cocaine base which was double the August 14, 2002 sale. Finally on October 15, 2002 the state authorities took him on a charge involving possession with intent to distribute 500 grams of cocaine base. Although the informant was clearly

setting the quantity, Mr. Davis was able to sell 122 grams of powder cocaine and nearly a kilogram of cocaine base from July 22 through October 15, 2002, a period of less than 3 months.

20. I believed that the danger of losing the 3 point downward adjustment for acceptance of responsibility was greater than any hope Mr. Davis had of prevailing on a sentencing manipulation argument. In fact, I said as much during the sentencing proceeding.

21. Although I believed that the agents were purposefully purchasing larger and larger quantities of cocaine base from Mr. Davis, that fact alone was not compelling enough for me to pursue a sentencing entrapment argument which would have required the government to play the tapes for the Court which I believed to be detrimental to Mr. Davis. In fact, the 10 year mandatory minimum threshold was breached when Mr. Davis made the July 31, 2002 sale which had a net weight of 124 grams of 53% pure cocaine base. The ten year mandatory minimum is exceeded at 50 grams, see 21 U.S.C. §841(b)(iii).

22. Mr. Davis's sentencing guidelines were accurately set forth in the presentence report. His base offense level was 36, because the relevant conduct including the federal and state arrests involved at least 500 grams but less than 1.5 kilograms of

cocaine base. Without considering acceptance or safety valve adjustments, his guideline range at Level 36 was 188-235 months which equaled 15 ½ to 19 ½ years imprisonment. It was critical for Mr. Davis to take advantage of the safety valve provisions of USSG §5C1.2(a)(1)-(5). Once he received the benefits of the Safety Valve, it was then critical for him to receive a 3 level reduction for Acceptance under 3E1.1(a)(b)(1).

23. The government stipulated with the defendant to the bottom of the guideline range which spanned a two year period. The guideline range at Level 31 was 108-135 months. Even with the 3 level reduction for Acceptance and the 2 level reduction for Safety Valve, it was critical to have the government agree to recommend to the Court the very bottom number of the guideline range at Level 31 which was 108 months. The fact that we were at Level 31 provided no guarantee that the Court would not impose a sentence in excess of 9 years. With these factors in mind, I did not consider it a close question as to whether we should raise the issue of sentencing manipulation especially since I was convinced that Mr. Runowicz would never be a party to such misconduct. Further, I believed that the progression in quantity alone was not sufficient to prevail with an entrapment argument.

24. With respect to the claim that the grounds offered for downward departure including aberrant behavior and extraordinary impact on the Davis family resulting from his incarceration were somehow futile is belied by the success I have had with an aberrant behavior motion for downward departure in another 2003 case. For example, in United States vs. Alan Haller, docket no: 3:03CR169(EBB), the Honorable Ellen Bree Burns departed downward in an Export Control Act case involving multiple sales of U.S. Munitions list items to Dubai and Pakistan. Judge Burns accepted the defendant's argument that his conduct was both aberrant and inconsistent with the manner in which he had previously conducted his life. Like Danvil Davis, the defendant in Haller, had no prior convictions, and Haller was a licensed exporter. The Second Circuit in United States vs. Gonzalez, 281 F.3rd 38, 47 (2nd Cir. 2002) invested the district court with broad discretion in downwardly departing for behavior that is aberrant.

> The Sentencing Commission specifically rejected a rule that would have "allowed a departure for aberrant behavior only in a case involving a single act that was spontanteous and seemingly thoughtless. USSG Supp. to App. C., amend, 603 commentary "reason for Amendment." The Commission saw the need to define aberrant behavior "more flexibly" and to "slightly relax" the "single act" rule.

Id., 281 F.3rd at 47.

9

25. The argument in favor of this particular departure as well as the extraordinary family circumstances were set forth in the Sentencing Memorandum submitted for Mr. Davis prior to sentencing. "Spontaneity of behavior and behavior of limited duration simply are not the same." Gonzalez, 281 F.3rd at 47.

26. I explained to Mr. Davis at the Walker Correctional Institution that as part of the plea agreement he was waiving his right to collateral attack of his conviction if his sentence did not exceed 135 months which was the highest sentence permitted at Level 31. This concept is extremely difficult for defendants to grasp, and I am in no position to say whether he had a full and meaningful appreciation of his right to bring a subsequent §2255 motion and what a resulting waiver of that particular right actually meant to him at the time I explained it or would mean to him in the future.

27. I explained to Mr. Davis that he was giving up his right to two different kinds of appeal, the first being direct appeal to the Court of Appeals and the second being a claim in the district court that his plea was somehow illegal or unconstitutional.

_____
ANDREW B. BOWMAN

Subscribed and sworn to before me this 6 th day of June, 2005

_____
Alan Neigher
Commissioner of the Superior Court

## CERTIFICATION

This is to certify that a copy of the foregoing was sent by facsimile transmission and mailed on this 6 day of June, 2005 to:

Michael Runowicz, Esq.
Assistant U.S. Attorney
157 Church Street
New Haven, CT 06510

Todd A. Bussert, Esq.
Flagg Building
103 Whitney Avenue, Suite 4
New Haven, CT 06510-1229

_____
ANDREW B. BOWMAN