IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| DANVIL DAVIS, Reg. No. 14904-014 | : |
| Federal Correctional Institution – Camp | |
|     Fort Dix, New Jersey | :   **DOCKET NOS.  3:02-cr-00275-JCH** |
| |                            **3:05-cv-00086-JCH** |
|     Defendant, | : |
| | |
| v. | :   December 12, 2005 |
| | |
| UNITED STATES OF AMERICA | : |

**DANVIL DAVIS'S REPLY TO GOVERNMENT'S OPPOSITION TO
MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
SENTENCE BY PERSON IN FEDERAL CUSTODY**

Danvil Davis, a person in federal custody under a judgment imposed by this Honorable Court, moved, on January 11, 2005, pursuant to 28 U.S.C. § 2255, the Rules Governing Section 2255 Cases in the United States District Courts (Dec. 2004) and Local Civil Rules of Procedure 3(b) and 8, to vacate the sentence imposed in the above-captioned matter for the limited purpose of considering discrete downward departure arguments available, but not raised, at sentencing. [Docket #35]. On June 20, 2005, the government filed a memorandum in opposition to Mr. Davis's motion that included an affidavit from Mr. Davis's trial counsel, Andrew Bowman. [Docket #43]. Pursuant to this Court's grants of additional time, Mr. Davis's reply to the government's opposition, and the factual assertions contained therein, is due December 12, 2005. [Docket # 48]. As reflected in the attached affidavits and a report from Marvin A. Steinberg, Ph.D., Mr. Davis did suffer from a serious gambling problem both before and during the period of his offense conduct — a situation about which his trial counsel knew, or should have reasonably known. Where the record is otherwise established, the issue of sentencing entrapment/manipulation is one of law.

## RIGHT TO COLLATERALLY ATTACK SENTENCE

In seeking to have this Court dismiss the instant motion on procedural grounds, that is, because of Mr. Davis's supposed waiver of the right to collaterally attack his conviction and sentence, the government submits that "there is no doubt that the defendant was fully aware of the decision he was making." Memorandum in Opposition ("Opp.") at 9-10. In furtherance of this position, the government cites that Mr. Davis had read the plea agreement, discussed it with counsel and "understood its provisions"; that the government explained the issue in open court; and that "trial counsel also explained this issue to the (sic) defendant pre-plea." Id. (citing Affidavit of Counsel ("Counsel Aff.")). Accordingly, relying on, inter alia, Garcia-Santos v. United States, 273 F.3d 506 (2d Cir. 2001), the government contends that Mr. Davis's petition for relief should be barred. Opp. at 10-11. Despite its best efforts, what the government fails to demonstrate is that Danvil Davis intentionally relinquished or abandoned a known right, particularly one of which he could not be advised by counsel. See Johnson v. Zerbst, 304 U.S. 458, 464 (1938).

The government interprets trial counsel's statements regarding discussions with Mr. Davis concerning the right to pursue a collateral attack to mean that that the issue was "explained" to Mr. Davis. Attorney Bowman makes clear, however, that "[t]his concept is extremely difficult for defendants to grasp, and I am in no position to say whether [Danvil Davis] had a full and meaningful appreciation of his right to bring a subsequent § 2255 motion and what a resulting waiver of that particular right actually meant to him at the time I explained it or would mean to him in the future." Counsel Aff. at 10 ¶26. Danvil Davis's affidavit demonstrates to that to the extent trial counsel raised the issue, he does not recall it. According to Mr. Davis, trial counsel met with him for approximately one hour to discuss the plea agreement, and, where Mr. Davis

2

was initially reluctant to accept it, he did so only after counsel assured him that "he would rigorously defend me to the judge." Movant's Affidavit ("Mov. Aff.") at 7 ¶23f [Exhibit ("Ex.") A]; see Id. at ¶24 (off-the-record discussion with trial counsel during the change of plea hearing concerned whether counsel "was going to tell my side of the story"); 9/19/2003 Tr. at 39 (The Defendant: "Can I ask counsel one question? … (Pause).").

Furthermore, to the extent that the government does not address two points raised in Mr. Davis's Memorandum in Aid of Determination Under Rule 4(b) [Docket #36], they should be taken as conceded. The first is that waivers are to be construed narrowly and strictly against the government, United States v. Ready, 82 F.3d 551, 556, 559 (2d Cir. 1996). Rule 4(b) Memo. at 3. The second is that the pro forma language of Mr. Davis's written plea agreement placed his trial counsel in an untenable ethical position that effectively left Mr. Davis without representation, particularly as it pertains to any claim concerning the constitutional sufficiency of post-plea representation. Id. Although, generally, courts should not legitimize such efforts to secure relinquishments of rights, which are introduced in many plea agreements, the record in this case shows a wanting inquiry at the change of plea hearing, thereby demonstrating that Mr. Davis did not knowingly waive his right to bring the instant petition. Id. at 4.

### DANVIL DAVIS SUFFERED FROM A DIAGNOSABLE GAMBLING PROBLEM

In the affidavit of trial counsel appended to the government's opposition, Attorney Bowman avers as follows:

> I was aware at the time and I remain aware of downward departure motions based upon compulsive behavior generally and specifically compulsions to gambling. Neither Danvil Davis, his sister Almena Thomspon, his former wife Deborah Davis, his girlfriend Lovenia Turner or his other siblings ever described factual circumstances from which I could infer that Mr. Davis became involved in these sales of cocaine and cocaine bases because of addiction to gambling or anything like it.

3

Counsel Aff. at 5 ¶18 (cited in Opp. at 17). Separately, trial counsel alleges, "At no time did Danvil, Danvil's former wife Deborah, his girlfriend of 13 years, Lovenia Turner, or his sister Almena Thompson ever describe Danvil as being a compulsive gambler or as an individual who squandered his earnings by gambling." Counsel Aff. at 5 ¶16. Leaving aside for the moment the fact that the government's confidential informant first approached Danvil Davis at the Tele Track or that Deborah Davis felt "that the gambling could have been a contributing factor to [Mr. Davis's] involvement in the instant offense," PSR, p. 9 ¶45, the attached affidavits from Mr. Davis, from his sister Almena Thompson [Ex. B] and from his ex-wife Deborah Davis [Ex. C], which address the government's concern that Mr. Davis heretofore offered insufficient information from "individuals with personal knowledge", accurately depict the length and severity of his gambling problems. Opp. at 16.

Danvil Davis began gambling around age nine or ten in Jamaica, when he used the little moneys he earned from selling fruit, running errands or collecting soda bottles to play "craps, dominoes, and hand-to-hand card games, like pluck jack, three-card pluckie or poker" at gambling houses near his family's home. Mov. Aff. at 2 ¶6. This behavior continued even after Danvil went to live with a great uncle, and later with an aunt and uncle. Id. at 2-3 ¶¶7-10. When Danvil was approximately 15 years old, his older sister, Almena Thomspon, brought him to live with her and her boyfriend in Spanish Town, Jamaica. Id. at 3 ¶11; Almena Thompson Affidavit ("Thompson Aff.") at 2 ¶7. However, his gambling only worsened, as he began to frequent the horse track in addition to continuing to play cards. Mov. Aff. at 3 ¶13; Thompson Aff. at 2 ¶8.

> Gambling became my first priority. It was a situation where I was betting whatever I got until the last race or until I was the last man in the game. I could never walk away if I won early. I sometimes went home broke on paydays. Other times, I owed as much as $1,000 or $2,000.... When I was short, I borrowed money from friends, who also gambled, or from the people with whom I was

4

>staying. This pattern continued for about seven years, until I
>moved to the United States.

Mov. Aff. at 3 ¶14; Thompson Aff. at 2 ¶8 (lost $1,000 gambling that brother had given to purchase furniture).

Moving to Hartford, Connecticut in 1988, Mr. Davis found work with New England Dairies. Mov. Aff. at 4 ¶15; PSR, p.12 ¶62. It was around this time, while living with his brother and sister-in-law, that Danvil met Deborah Davis, whom he married in November 1998. Mov. Aff. at 4 ¶15; Deborah Davis Affidavit ("D. Davis Aff.") at 1 ¶4. Danvil was then working the night shift (6:00 pm to 2:00 am) while Deborah worked a standard day shift as an accountant at Westinghouse Elevator Company. Id. at 1 ¶6.

Danvil recalls that upon immigrating to the United States, his gambling "was quiet"; he played Lotto and the daily number. Mov. Aff. at 4 ¶16. After a few months, though, a co-worker introduced him to Keeney Park in Hartford, where gamblers congregated: "There would be 50-to-100 gamblers' cars, a lot of whom were West Indian. People would also park minivans together and set up tables, where they played cards or dominoes for between $20-to-$50 per game." Id. at ¶16a.[1] Not only did Mr. Davis begin going to Keeney Park regularly, he also gambled in peoples' homes and at the Tele Track; "[m]y life became one of gambling and drinking each day after work either at the Tele Track, Keeney Park or a gambling house." Id. at ¶16b-d; Thompson Aff. at 3 ¶12 ("If Danvil was not at the Tele Track, he was at Keeney Park.")

Not until the second year of marriage did Deborah Davis sense the extent of Danvil's gambling. D. Davis Aff. at 2 ¶8. Yet, she witnessed firsthand his losses, which included the

---

[1] Surveillance video recorded during the course of the government's investigation, which was disclosed to trial counsel, shows what purports to be Mr. Davis in the parking lot of park-type setting on July 31, 2002 and on August 14, 2002. Additionally, audiotapes from consensually recorded calls made with the assistance of the government's cooperating sources include numerous references to meeting in the park.

5

squandering of almost $25,000 in settlement moneys received after an automobile accident. Id. at ¶8e. In June 1992, Ms. Davis forced Danvil from the home "because of his gambling and his lifestyle generally." Id. at 3 ¶9. Of particular concern was Danvil having taken their young daughter with him to the Tele Track and to Keeney Park, and his using their joint moneys to support his gambling despite knowing they were on a limited budget. Id. During the period of separation, Danvil stayed with his sister Almena, who insisted that he attended Gamblers' Anonymous. Thompson Aff. at 3 ¶11; Mov. Aff. at 5 ¶19. "When he stopped attending, Danvil commented that he had not lost his home or business like others at the meetings." Thompson Aff. at 3 ¶11. What Danvil did lose was his marriage and stability in his life.

Ms. Davis reports that the couple's reconciliation, around Thanksgiving 1992, was short-lived because "his gambling only got worse. He was at the Tele Track all the time. He sometimes went without eating." D. Davis Aff. at 3 ¶10. The Davises formally separated in July 1993, but Deborah recalls that "Danvil's gambling only got worse and worse and worse." Id. at ¶11. He failed to make either his car or rent payments, leading Almena, who had co-signed on the vehicle, to effect a voluntary repossession and his sister-in-law to evict him from his apartment. Thompson Aff. at 2-3 ¶10-11; D. Davis Aff. at 3 ¶11. Moreover, it got to a point that Ms. Davis met Danvil Mondays on his truck route to ensure that she received child support, and she went occasionally to Keeney Park to get moneys. Id.; Mov. Aff. at 5 ¶18. Where Danvil was usually responsible in providing support for his daughter, in the Summer of 2002, Deborah Davis grew "very concerned" when he failed to make payments for several months: "He was working for the City of Hartford and kept telling me that he would give me money on Friday, but Friday never came. When I called to ask what had happened, he said that he had lost the money at the track

6

but that he planned to double up the next week to get it back." D. Davis Aff. at 4 ¶12; see Mov. Aff. at 5 ¶17 ("Gambling was like a revolving door.").

Subsequent to Mr. Davis's arrest, Almena Thompson met with and retained Attorney Bowman to represent her brother. Thompson Aff. at 3 ¶14. She also met with him on subsequent occasions and spoke with him by phone. Id. On the issue of her brother's gambling, Ms. Thompson recalls that:

> [D]uring one of our first meetings I told Attorney Bowman that while I did not know if it made any difference to Danvil's legal situation, I thought he had a gambling problem, noting that Danvil loved betting on horse races and that I had taken him to Gamblers Anonymous. Attorney Bowman responded that he did not want to get into Danvil's gambling, stating that it would not be good for Danvil because the judge would think that he sold drugs to support his gambling. Even though I had my doubts, I did not argue with Attorney Bowman because I am not an attorney and I trusted him to make the right decisions. Later, after Danvil was released on bond, I went with him to a meeting at Attorney Bowman's office. The gambling issue was brought up again, and Attorney Bowman again stated that it would not look good. Attorney Bowman's refusal to raise the gambling issue became a point of frustration for Danvil, particularly because Danvil understood from prior discussions with Attorney Bowman that, at some point, Attorney Bowman would explain to the Court how he became involved in the situation.

Id. at 4 ¶16b. Additionally, Ms. Thompson confirms that when asked to bring Danvil's wallet, which police had seized at the time of his arrest, to trial counsel's office after Mr. Davis's proffer session, "Attorney Bowman opened the wallet in front of me. It was filled with racehorse tickets that looked alike. Danvil had written names and numbers on some of the tickets." Id. at 3-4 ¶15; Mov. Aff. at 5 ¶20 ("wallet was usually filled with betting slips").

Mr. Davis remembers making various statements to his counsel that both concerned his gambling and provided some corollary between his problems and his offense conduct. For one, it appears that Attorney Bowman requested Ms. Thompson to bring him Danvil's wallet because

7

Danvil had disclosed that the telephone number for the individual he contacted to obtain the drugs — someone he knew from the Tele Trak — was written on a "bet ticket" in his wallet, which also contained "$200 and $500 tickets, other tickets with names and numbers and receipts from trifectas."  Mov. Aff. at 6 ¶22c, 7 ¶23e.  Mr. Davis also told Attorney Bowman that all he did "was go to work and gamble," and that upon receiving the $200 he was paid for the original transaction, both he and the guy who first approached him at the Tele Track went back to bet, with Mr. Davis losing "the entire $200."  Mov. Aff. at 6 ¶22b, 7 ¶23f.  Mr. Davis submits that he wanted Attorney Bowman to "tell my side of the story" and met with him after sentencing to express his frustration.  Id. at 6-7, ¶¶ 26-27.  According to Ms. Thompson, who sat in on the post-sentencing meeting, "Danvil asked Attorney Bowman why he did not tell the judge about the events that led up to the offense, like how he made contact with the informant.…  Danvil stated that he thought Attorney Bowman was going to tell the Court how he gotten involved from the beginning."  Thompson Aff. at 4 ¶17 12/8/2003 Tr. at 39 ("I have a hobby which is playing dominoes and going to the Teletrack and betting on horserace and one day I was there, losing my money, and this guy just said to me, do I know anybody that have that?").

      The foregoing establishes that Mr. Davis's trial counsel was aware that Danvil Davis had a gambling problem but took no action on the information he was provided.  One reasonable step would have been to have Mr. Davis assessed by a trained clinician to evaluate whether he suffered from a diagnosable gambling disorder and, if so, whether that disorder influenced his offense behavior, as Ms. Davis submitted to the Probation Office that it did.  This past July, such an assessment was undertaken when Dr. Marvin Steinberg, a licensed psychologist who was worked in the area of problem gambling for 30 years, including as Executive Director of the Connecticut Council on Problem Gambling and as co-author of the American Gaming Association's

8

Responsible Gaming Resource Guide, met with Mr. Davis at FCI Fort Dix-Camp and interviewed Almena Thompson and Deborah Davis in preparation of a report, which is appended hereto as Exhibit D.

In Dr. Steinberg's professional opinion, Mr. Davis suffers from "Pathological Gambling," a progressive disorder typically resulting over time in negative personal, family, occupational, financial and often legal consequences. Ex. D at 1-2. For the Court's consideration, Dr. Steinberg submits:

> Under the assumption that Mr. Davis and his relatives provided a substantially accurate picture of Mr. Davis's prior history, it appears likely that the behavior that resulted in Mr. Davis's conviction was to a large extent the product of a chronic gambling disorder.

Ex. D at 2. In other words, evidence of a direct causal link between Mr. Davis's condition and his offense conduct did exist at the time of sentencing which his trial counsel failed to present. Opp. at 17-18; but cf. United States v. Sadolsky, 234 F.3d 938, 942-43 (6th Cir. 2000) (downward departure for compulsive gambling does not require that it motivated offense conduct).

Here, the Court finds a first-time, nonviolent offender who, through voluntary entrance into a plea agreement, appeared for sentencing with an agreed upon guideline range of 108-to-135 months' imprisonment, though having reserved the right to raise departure issues and seek a sentence below the agreed upon range. Where the defendant presumed that his attorney would articulate his version of events and raise any corresponding bases for sentencing relief, the Court received little more than a personal aside in the presentence report concerning the nature and extent of Mr. Davis's gambling problems. Inasmuch as this issue was an appropriate basis for downward departure within the Court's discretion, Mr. Davis was prejudiced by his attorney's failure to develop the record and submit it for the Court's consideration. See United States v.

9

Motto, Nos. CR.A. 99-297, CIV.A. 01-2676, 2002 WL 1018575 (E.D.Pa., May 17, 2002) (limited resentencing granted where defense counsel's failure to press for downward departure "was unreasonable under prevailing professional norms" and a "real probability" existed that but for said deficiency the outcome would have been different).

### SENTENCING ENTRAPMENT/MANIPULATION

Inasmuch as the record of Danvil Davis's offense conduct was fully developed through the government's investigation and the defendant's ready admissions, the history of purchases he helped facilitate is well known to the Court. That said, in claiming that his trial counsel was ineffective for failing to raise the question of sentencing entrapment or sentencing manipulation as a departure issue meriting the Court's consideration, Mr. Davis does not, as the government suggests, argue "simply that he should have been arrested sooner." Opp. at 14, 15.[2] Rather, Mr. Davis submits that it was the government who established the types of quantities of drugs he arranged to supply its agents via third parties, and that such manipulation can provide an appropriate legal basis to depart from a defendant's recommended guideline range.

Mr. Davis's trial counsel recognized that "the informant was clearly setting the quantity" and "believed that the agents were purposefully purchasing larger and larger quantities of cocaine base from Mr. Davis." Counsel Aff. at 6 ¶19, 7 ¶21.[3] However, counsel "did not consider it a close question as to whether we should raise the issue of sentencing manipulation… I believed

---

[2] Elsewhere in its memorandum, the government observes correctly that Mr. Davis's "claims focus on post-plea activities and center on his assertion that his attorney did not pursue several areas of departure." Opp. at 9.

[3] Through the instant motion, Mr. Davis does not allege or imply that AUSA Michael Runowicz engaged in any misconduct. See Counsel Aff. at 8 ¶23 (convinced AUSA would never be a party to sentencing manipulation). Concurrently, Mr. Davis notes that Attorney Runowicz's statements to the Court suggest he was unable to elicit a complete version of events from case agents. 12/8/2003 Tr. at 43 (unable to say why DEA sent two confidential informants to meet with defendant on July 18, 2002), 46 (could not get specifics from agents regarding why they considered defendant a drug dealer).

10

that the progression in quantity alone was not sufficient to prevail with an entrapment argument." Id. at 8 ¶23.  Notwithstanding the incongruity of these statements — belief of purposeful progression in quantity being insufficient evidence of manipulation — or his election not to raise the issue of entrapment/manipulation in Mr. Davis's sentencing memorandum, trial counsel said nothing concerning the potential propriety of a lesser sentence when confronted with this Court's obvious difficulties in reconciling Mr. Davis's background with the offense for which he stood convicted.  Rule 4(b) Memo. at 5.  The idea that Mr. Davis would have jeopardized his acceptance of responsibility reduction, Counsel Aff. at 7 ¶20, is unpersuasive given Mr. Davis's forthrightness in speaking with the government as well as the simple fact that, by definition, entrapment involves an admission of wrongdoing.

## HEARING REQUESTED

As the government correctly notes, "Section 2255 provides that a court shall hold an evidentiary hearing 'unless the motion and the files and records of the case conclusively show that a prisoner is entitled to no relief'."  Opp. 19-20.  Mr. Davis respectfully submits that the record, as thus far established, warrants a hearing, or at a minimum, further expansion of the record, to include subpoenas.  In making this alternative request, Mr. Davis notes that, in June, he provided a release to trial counsel authorizing trial counsel to provide undersigned counsel a complete copy of his file, to include work product.  Trial counsel did not respond, however, to that release or subsequent written and verbal inquires, leaving open several questions concerning his representation (e.g., scope of investigation into legal bases for departure) and his sworn statement (i.e., inconsistencies with others' statements).

Dated:  December 12, 2005			Respectfully submitted,
						THE PETITIONER

        /s/ Todd Bussert
By: TODD BUSSERT, CT24328
   103 Whitney Avenue, Suite 4
   New Haven, CT 06510-1229
   (203) 495-9790; Fax: (203) 495-9795
   tbussert@bussertlaw.com

   Attorney for Movant

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the Mr. Davis's Response was served via first class mail, postage prepaid, this 12th day of December 2005 on the following:

  AUSA Michael E. Runowicz
  United States Attorney's Office
   for the District of Connecticut
  P.O. Box 1824
  New Haven, CT 06510

      /s/ Todd Bussert
     Todd A. Bussert